In re **INITIATIVE PETITION NUMBER 259, STATE QUESTION 376.**

**No. 37305.**

Supreme Court of Oklahoma.

July 1, 1957.

Rehearing Denied Sept. 30, 1957.

Miller & Wilson, George Miller, Jr., Jack Ewing Wilson, Oklahoma City, for proponents.

Johnson, Gordon, Cook & Cotter, Rowe Cook, Oklahoma City, for appellant and protestant.

JACKSON, Justice.

This case involves an appeal from a decision of the Secretary of State upholding the sufficiency of Initiative Petition No. 259, State Question No. 376. The proposed petition provides for county option in the sale and distribution of what is commonly known as 3.2 beer.

Since the appeal was filed in this court the protestant, hereinafter called appellant, has determined that the petition contains a sufficient number of legal signatures for its submission as a Constitutional Amendment and has dismissed his appeal in so far as it questions the number and validity of the signatures to the petition. This leaves for consideration the general questions of whether the petition is sufficient in form and substance.

Provision is made for the Initiative and Referendum in Art. V, secs. 1–8, Oklahoma Constitution. Under Art. V, sec. 3, Constitution, the Legislature is directed to make "suitable provisions for carrying into effect the provisions of this article." Art. V.

The petition to the Governor provides, in part, as follows:

"We, the undersigned citizens and legal voters of the State of Oklahoma, respectfully order that the following proposed amendment to the Constitution of the State of Oklahoma shall be submitted to the legal voters of the State of Oklahoma for their approval or rejection * * *.

"The question we herewith submit to our fellow voters is: Shall the following proposed amendment to the Constitution of the State of Oklahoma be adopted."

Then follows a complete copy of the title and text of the proposed measure as required by 34 O.S.1951 § 2. This proposed measure provides for elections in counties to prohibit or permit manufacture, sale or other distribution of beverages containing more than one-half of one per cent (½ of 1%) of alcohol by volume and not more than three and two-tenths per cent (3.2%) of alcohol by weight, and provides procedure for holding county elections.

It is earnestly contended by appellant that the proposed measure cannot be adopted as an amendment to the Constitution. It is first contended that the "title and text of the proposed measure" is (1) drawn in the

language and form of a statute and (2) its "substance" deals with statutory matter. It is not contended that there is any language in our Constitution and statutes that requires proposed constitutional amendments to be in any particular form or verbiage, or of any particular substance. However, it is contended that our Constitution cannot be amended by an initiated measure, which shows by its contents that it is a mere legislative act. It is admitted by the proponent of the measure that as to the form and language of the "text" it has the appearance of a legislative enactment. However, he insists that the "substance" of the measure, notwithstanding its appearance, is appropriate for an amendment to the Constitution.

These questions have not heretofore been presented to this court.

Appellant quotes at length from State ex rel. Halliburton v. Roach, 1910, 230 Mo. 408, 130 S.W. 689. Therein it was proposed to amend the Constitution of Missouri to provide for fixing State senatorial districts that would be effective for a period of ten years, or until the next Federal census. Thereafter the senatorial districts were to be fixed by a law enacted by the people (by initiative petition), or by the Legislature, and adjusted on the basis of that census. That court held in substance that the *allegations* of an initiative petition determine its character and the fact that such petition calls the matter a proposed amendment does not determine that it is an amendment instead of a legislative act. The court further held that an initiative petition initiated in 1910 fixing state senatorial districts which shall continue until the Federal census of 1920, when these districts shall by a law enacted by the people, or by the Legislature, be adjusted on the basis of that census, is a petition for a legislative enactment *of a temporary character,* and not a petition for a constitutional amendment; *a "constitution" being a fundamental law as distinguished from a temporary act,* and *implying an instrument of a permanent nature.* The court concluded that a proposed amendment to the Consti-

tution must in fact be an amendment to the Constitution and not just a temporary legislative measure. The proposed amendment was rejected as being statutory or legislative in nature.

The foregoing decision appears to be persuasive. However, the decision must be interpreted in light of the facts in the case. It will be observed from a careful examination of the case that the proposed amendment was *temporary* in nature as distinguished from *permanent.* This, together with other objectionable features therein discussed, was considered sufficient cause to reject it as a constitutional amendment. The *temporary* nature of the proposed amendment seems to be the controlling feature in that case.

In Marsh v. Bartlett, 1938, 343 Mo. 526, 121 S.W.2d 737, the Missouri Court in evaluating the Halliburton case, supra, at page 741 of 121 S.W.2d, said:

"In the Halliburton Case the question was whether the initiative petition which was there under review proposing an amendment to change the method for dividing the state into senatorial districts, was valid. * * *.

"The gist of the majority holding therein was that the proposed amendment was not valid, because in effect it was not organic law but a *temporary* legislative act, and should not be submitted under the false cognomen of an amendment. The Halliburton decision was disapproved by a majority opinion in the Stokes Case, supra [State ex rel. Stokes v. Roach, Mo.Sup., 190 S.W. 277], Graves, J., dissenting in a separate opinion filed. * * *."

While it appears from the language in the Marsh case, that the Halliburton decision has been disapproved, we are of the opinion that it was disapproved on grounds not involved herein.

The Marsh case is interesting in that the issues therein raised and determined are identical to many of the propositions here presented. In that case Marsh was arrested and charged with catching a large mouth

bass during the closed season in violation of certain sections of the statutes. He was convicted, fined, refused to pay, and was committed to jail by Bartlett, the sheriff. The statute, *if effective,* had been violated.

Marsh contended that the statute had been repealed by Constitutional Amendment No. 4, and that the statute had been supplanted by a certain regulation of the Conservation Commission. The amendment provided that the control of all fish * * * and wild life resources of the State * * * shall be vested in the Commission and further provided that all existing laws inconsistent therewith shall no longer remain in force and effect.

It was the Sheriff's position, among others, that the amendment when tested by the touchstone of the Constitution itself was lacking in essentials of a valid constitutional amendment; that it was not organic law but a legislative act unrelated and incongruous with the Constitution which creates a three-fold division and separation of governmental powers, a form of constitutional government common to most of the States of the Union. In upholding the amendment the court, at pages 742 and 743 of 121 S.W. 2d, said:

"* * * So, it follows that our immediate question is upon * * * the broad policy it declares regarding the subject matter of the Amendment, namely, 'The control, management, restoration, conservation and regulation of the bird, fish, game, forestry and all wild life resources of the state * * *.' This policy-creating portion which determines the object to be accomplished is necessarily within the attack made on the Amendment as a whole, that it is legislative in character, and by reason thereof, violates Section 1 of Article 4 of the Constitution, Mo. St.Ann.Const. art. 4, § 1. * * *.

"We have not been directed to any provision of the Constitution which expressly or impliedly limits the content of an amendment thereto * * *. Hence * * * the Amendment does not infringe on the Constitution as it

speaks today. * * * And we think it is in harmony, in its nature and its attributes considered in this opinion, with the remainder of the Constitution, even though the former in its entirety is legislative in its nature. * * *.

"* * * In the Bill of Rights (Sec. 1, art. 2) as found in the Constitution, Mo.St.Ann.Const. art. 2, § 1, it is declared 'That all political power is vested in and derived from the people; that all government of right originates from the people, as founded upon their will only, and is instituted solely for the good of the whole.' In view of these reservations of sovereignty and of the right to exercise functions thereof in the State's government, it seems self-evident that the exercise thereof in this particular instance to provide in the mode selected and to the extent effected by an enduring ordinance, policy-forming as to its subject matter and rule-delegating as regards the administrative functions and imposed duties, was valid notwithstanding the general field for action by way of statutory enactments had theretofore been entered solely by successive Legislatures. That condition, long existing, continued merely because until of late the people did not attempt to exercise their stated reserved authority. * * *."

Coming now to the Oklahoma Constitution, statutes and court decisions on the subject of reserved powers and initiative petitions, we find the following:

"* * * the people reserve to themselves the power to propose laws and amendments to the Constitution * * *." Art. V, § 1, Const.

"The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and fifteen per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so

proposed. * * *." Art. V, § 2. Const.

" * * * The Legislature shall make suitable provisions for carrying into effect the provisions of this article." Art. V, § 3, Const.

34 O.S.1951 § 24 provides:

"The procedure herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded."

In Ruth v. Peshek, 153 Okl. 147, 5 P.2d 108, 111, in the body of the opinion this court said:

"The people reserved to themselves the power to propose laws and amendments to the Constitution, * * *. This power so reserved to the people should not be crippled, avoided, or denied by technical construction by the courts. It is the duty of the courts to construe and preserve this right as intended by the people in adopting the Constitution, and thereby reserve unto the people this power."

"Ours is a government which rests upon the will of the governed. The initiative and referendum is the machinery whereby self-governing people may express their opinion in concrete form upon matters of public concern. If the people are to be self-governed, it is essential that they shall have a right to vote upon questions of public interest and register the public will."

In the second paragraph of the syllabus in Cress v. Estes, 43 Okl. 213, 142 P. 411, this court expressed its view of the initiative as follows:

"The power to propose and adopt a proposition of any nature and to amend their Constitution is vested in the people of the state, and in the exercise of such power they constitute the legislative branch of the government and are not subject to interference or control by the judiciary."

We have carefully searched the Constitution and statutes and find nothing therein that rejects a proposed constitutional amendment because it has the appearance, form, and substance of a statute or legislative matter. While it may be within the power of the Legislature to so provide it has not done so. Since the power to make suitable provisions for carrying into effect the initiative has been specifically given to the Legislature, it was not intended that this power would be exercised by the courts.

While the provision for, and the regulation and control of the sale and distribution of 3.2 beer has been left in the legislative field since 1933, we are of the opinion that the people may exercise their reserved power, if they so desire, and provide, in the manner proposed, an enduring ordinance in the form of an amendment to the Constitution providing for County option in the sale and distribution of beer. We hold that the statutory language and form appearing in the proposed amendment is not fatal to its submission as an amendment to the Constitution.

In his second proposition appellant asserts that the text of a proposed amendment to the Constitution must refer to the Constitution or to some section thereof. The Constitution and statutory provisions do not so provide.

In State Question No. 362, Legislative Referendum No. 108, a constitutional amendment was proposed. Neither the text of the measure, nor the ballot title, refers to any section or article of the Constitution to be amended. That amendment was adopted by the people and is now a part of our Constitution. See 1955 Directory of the State of Oklahoma, page 193, for ballot title and see Art. XI, § 6, as amended in 1954.

If the proposed amendment is amendatory of any section of the Constitution it would, if adopted, amend any section of the Constitution in conflict therewith whether mentioned or not. The substance and purpose of the proposed amendment is

to provide County Option in the sale and distribution of "3.2 beer." Art. 1, § 7, Okl. Const., and the Prohibition Ordinance (Page 929, Book 2, Oklahoma Statutes Ann.Const.) provide, in part, as follows:

"The * * * furnishing * * * of intoxicating liquors * * * is prohibited for a period of twenty-one years * * * and thereafter until the people of the State shall otherwise provide by amendment of this Constitution and proper state legislation. Any person * * * who shall * * * sell * * * or otherwise furnish any intoxicating liquor of any kind, including *beer* * * * shall be punished * * *."

While it has been determined that 3.2 beer is non-intoxicating (37 O.S.1951 § 1 et seq.—State ex rel. Springer v. Bliss, 199 Okl. 198, 185 P.2d 220), it is apparent that if the proposed amendment is amendatory of any section of the Constitution it would be amendatory of Art. I, Sec. 7, supra.

■■ Since the Constitution and statutes make no requirement that a proposed amendment refer to the Constitution or the section to be amended, and since the proposed amendment would, if adopted, amend any section of the Constitution in conflict therewith, we conclude that it is not necessary for the text of the proposed amendment to refer to the Constitution or any section thereof.

■ It is contended that the proposed amendment is fatally defective for the reason that it will, if adopted, amend Art. V, § 3, Okl.Const., as to the time of holding elections and that nowhere in the title or body of the proposed measure is there any reference to amending this section of the Constitution. We recognize that the proposed amendment may, if adopted, be amendatory of Art. V, § 5, and other sections of the Constitution and it is apparent that the title and body of the proposed measure makes no reference to amending or changing any section of the Constitution. Art. V, § 57, Okl.Const., provides

that every act of the *Legislature* shall embrace but one subject, which shall be clearly expressed in its title. This is not required of initiated measures. See Ramsey v. Persinger, 43 Okl. 41, 141 P. 13.

Appellant contends that it will be impossible to prepare a ballot title. It is argued that since the ballot title must contain the words "constitutional amendment" and the text of the measure does not refer to the Constitution or section to be amended, the ballot title cannot refer to the Constitution. While this proposition is premature (See 34 O.S.1951 §§ 9 and 10) we think it may be helpful if we dispose of the issue at this time.

34 O.S.1951 § 9, provides for a ballot title which shall contain the gist of the *proposition.* The proposition presented in this petition is a "proposed amendment to the Constitution" authorizing county option, and the question presented is: "Shall the following proposed amendment to the Constitution of the State of Oklahoma be adopted."

■ We are of the opinion and hold that the above quotations are a part of the "proposition" and should be considered in the preparation of the ballot title, although these quotations do not appear in the text of the measure.

It is further contended that the petition as circulated is a fraud upon its face, and that the persons who signed the petition were entitled to be informed by the petition itself whether they were signing a petition seeking an election on a proposed legislative measure or constitutional amendment.

The people of Oklahoma are familiar with the historical fact that the Enabling Act required prohibition in this State for a period of twenty-one years after statehood. Intoxicants of all kinds, "including *beer,* ale, and wine" were specifically mentioned in the Constitution (Art. I, § 7, Const., supra). Various proposed amendments have been submitted to the people for repeal of the prohibition clause in our

Constitution. We think the people of Oklahoma, including the petitioners, are well informed generally on the difference between a proposed amendment to the Constitution and an initiated statutory measure, especially in the field of prohibition.

■ The initiative petition herein sets forth clearly that the measure is proposed as an amendment to the Constitution. We fail to see how petitioners could have been misled or misinformed by the petition.

It is finally argued by appellant that the proposed constitutional amendment contains misleading and contradictory provisions, and that this court should hold such petition legally insufficient and void. We think this argument, and the argument heretofore advanced that the proposed amendment, if adopted, will contradict other sections of the Constitution has been answered in many decisions of this court.

■ In the early case of Threadgill v. Cross, 26 Okl. 403, 109 P. 558, at page 563 of the Pacific Reporter, this court said:

"* * * We refrain from expressing any opinion whatever upon what the effect of such amendment will be, if adopted. That question can and will be determined only when it is presented to this court in the course of litigation by some litigant whose rights are involved hereby."

■ We adhere to the rule there expressed.

Our attention is invited to Secs. 22 and 23 of the proposed amendment. These sections provide:

"Section 22. If any section, paragraph, sentence or phrase of this Act shall be declared unconstitutional or void for any reason by any court of final jurisdiction, such Act shall not in any way affect the remaining sections, paragraphs, sentences, or phrases of this Act, but the same shall continue in full force and effect.

"Section 23. All Acts and parts of Acts in conflict herewith are hereby repealed."

It is argued that these provisions have no place in a constitutional amendment for the reason that the sections, paragraphs, sentences and phrases cannot be unconstitutional if they are a part of the Constitution. It is also pointed out that all Acts and parts of Acts in conflict with the amendment, if adopted, will be repealed whether the amendment so provides, and that the two sections (22 and 23) are pure surplusage and *neither* add to nor subtract from the meaning or effect of the proposed measure. We are in full agreement with this argument.

Proponent invites our attention to 34 O. S.1951 § 8, which provides in part:

"* * * If the court shall adjudge such petition insufficient the parties responsible for same shall have the right to correct or amend their petition to conform to the opinion of the court, provided said amendment or change is made within five days. * * *."

In proponent's supplemental brief he authorizes this court, in the event certain defects are found objectionable, to alter or amend the petition by deleting and adding such language as the court deems necessary and proper, citing In re Initiative Petition No. 1, City of Drumright, Okl., 298 P.2d 409, 410, where in the third paragraph of the Syllabus we held:

"When an initiative petition proposing the repeal of a city charter has been found sufficient to meet the requirements of law, and the petition also contains other proposals which are in conflict with the laws of the State, this court may strike the objectionable matter and adjudge the petition as amended sufficient."

■ In that case the signers of the petition as well as the proponents authorized us to strike the objectionable matter. In the instant case the signers of the petition have not authorized any deletions from the petition. However, we know of

no reason why this court may not strike "Pure Surplusage" from a proposed initiative measure where to do so would not change in any manner the nature and substance of the petition as signed and presented.

Having concluded that sections numbered 22 and 23 are surplusage, and neither add to nor subtract from the meaning and effect of the proposed amendment, said sections numbered 22 and 23 should be, and the same are, hereby stricken from the petition. With sections 22 and 23 stricken, the petition is held to be sufficient as required by the statutes for the calling of an election thereon.

It is ordered that upon the filing of this petition and mandate, the clerk of this court shall transmit to the Secretary of State a certified copy of same, and the Secretary of State shall proceed in the manner provided by law, and not inconsistent with this opinion.

CORN, V. C. J., and HALLEY, WILLIAMS, BLACKBIRD and CARLILE, JJ., concur.

WELCH, C. J., and DAVISON and JOHNSON, JJ., dissent.

WELCH, Chief Justice (dissenting).

In deciding this case we are not concerned, and judicially we cannot be concerned here with any issue for or against the sale of beer, or for or against local option. We are here concerned only with the legal question whether the proposal here involved is, in its stated terms and provisions, such as may be properly submitted to the voters of the State to be adopted as an amendment of the Constitution of Oklahoma.

Protestant contends that the sponsor or sponsors of this initiative petition, or the person or persons who prepared it in the first place, are in effect undertaking to submit a statutory enactment to be voted on by the people as a constitutional amendment. The protestant contends that at the 1955 Session of the Oklahoma State Legislature there was introduced H.B. 827 dealing with certain alcoholic beverages, defining the same and providing for county option as to the sale thereof, etc., which bill was not adopted by the Legislature, and that thereafter the sponsors of the circulation of this initiative petition merely copied H.B. 827, omitting only the final section of the "Bill," which was the emergency clause, and that thereby the original sponsor or sponsors undertook to circulate the legislative "Bill" and to have it petitioned to be voted on for incorporation in our Constitution as an amendment thereto.

From a comparison of the "proposal" with H.B. 827 it seems to me that this contention is fairly well sustained. I here quote the "proposal" and H.B. 827 in parallel columns.

---

Proposal:

An Act Relating To Certain Alcoholic Beverages: Authorizing County Option; Providing For Elections In Counties To Prohibit Or Permit Manufacture, Sale Or Other Distribution; Providing Procedure; Fixing Penalties.

Be It Enacted By The People Of The State Of Oklahoma;

Section 1. Reference may be made to this Act as the

House Bill 827: (1955 Legislature)

An Act Relating To Certain Alcoholic Beverages: Authorizing County Option; Providing For Elections In Counties To Prohibit Or Permit Manufacture, Sale Or Other Distribution; Providing Procedure; Fixing Penalties.

Be It Enacted By The People Of The State Of Oklahoma:

Section 1. Reference may be made to this Act as the

### "County Option Law."

As used in this Act the following terms, unless the context otherwise indicates, shall have the following meanings:

(a) "Beverage" or "beverages" shall mean and include any beverage containing more than one-half of one per cent (½ of 1%) of alcohol by volume and not more than three and two-tenths per cent (3.2%) of alcohol by weight.

(b) "Person" includes the singular and plural number, and shall mean and include a natural person, estate or trust, association, co-partnership or corporation.

(c) "Election" means an election held for the purpose of a vote of the people of a county as to the prohibition or permission of the manufacture, sale, barter, furnishing or transporting of such beverages in said county.

Section 2. Upon application by written petition filed with the county clerk of any county in this State, signed by a number of legal voters in such county equal to fifteen per cent (15%) of the total number of votes cast at the last general election for the state office receiving the highest number of votes at such election in such county, it shall be the duty of the Board of County Commissioners of said county, at the next regular meeting of said board, after twenty (20) days from the filing of the petition, to make an order directing a special election to be held in said county on a day not less than forty (40) nor more than sixty days after the making of such order, for the purpose of submitting to the legal voters of said county the proposition whether the beverages described in Section 1 of this Act may be manufactured, sold, bartered, given away or otherwise furnished, or transported, or received, in such county.

Such order shall be in substantially the following form:

### Order

A sufficient petition having been filed as provided by law, it is ordered that on ——, the —— day of ————, 195—, an election shall be held throughout ———— Coun-

### "County Option Laws of 1955."

As used in this Act the following terms, unless the context otherwise indicates, shall have the following meanings:

(a) "Beverage" or "beverages" shall mean and include any beverage containing more than one-half of one per cent (½ of 1%) of alcohol by volume and not more than three and two-tenths per cent (3.2%) of alcohol by weight.

(b) "Person" includes the singular and plural number, and shall mean and include a natural person, estate or trust, association, co-partnership or corporation.

(c) "Election" means an election held for the purpose of a vote of the people of a county as to the prohibition or permission of the manufacturer, sale, barter, furnishing or transporting of such beverages in said county.

Section 2. Upon application by written petition filed with the county clerk of any county in this State, signed by a number of legal voters in such county equal to fifteen per cent (15%) of the total number of votes cast at the last general election for the state office receiving the highest number of votes at such election in such county, it shall be the duty of the Board of County Commissioners of said county, at the next regular meeting of said board, after twenty (20) days from the filing of the petition, to make an order directing a special election to be held in said county on a day not less than forty (40) nor more than sixty days after the making of such order, for the purpose of submitting to the legal voters of said county the proposition whether the beverages described in Section 1 of this Act may be manufactured, sold, bartered, given away or otherwise furnished, or transported, or received, in such county.

Such order shall be in substantially the following form:

### Order

A sufficient petition having been filed as provided by law, it is ordered that on ——, the —— day of ————, 195—, an election shall be held throughout ———— Coun-

ty, for the purpose of submitting to the legal voters of said county the proposition of whether beverages containing more than one-half of one per cent (½ of 1%) of alcohol by volume and not more than three and two-tenths per cent (3.2%) of alcohol by weight may be manufactured, sold, bartered, given away or otherwise furnished, or transported, or received in said county. The proposition will be stated on the ballot as:

Shall the County Option Law be adopted (or "abandoned and no longer in effect") in ——— County?

This — day ———, 195—.

Board of County
Commissioners,

_____
Chairman

Attest:

_____
County Clerk

Section 3. Such petition shall be substantially in the following form:

Petition

To The
Board Of County
Commissioners Of
——— County,
State Of Oklahoma:

We, the undersigned citizens and legal voters of the State of Oklahoma and of the County of ———, respectfully order that the hereinafter described proposition shall be submitted to the legal voters of said state and county for their approval or rejection at a special election to be called and held as in this Act provided, and each of us for himself says:

I have personally signed this petition; I am a legal voter of the State of Oklahoma and of ——— County and am a legal voter and registered in the county written after my name; my residence and post office are correctly written after my name. The question we herewith submit to our fellow voters is: Shall the manufacture, sale, barter, giving away, furnishing, receiving and transportation of

beverages containing more than one-half of one per cent ($\frac{1}{2}$ of 1%) of alcohol by volume and not more than three and two-tenths per cent (3.2%) of alcohol by weight be prohibited (or permitted, if at that time prohibited) in ———— County.

Name ————————
County ————————
Residence ————————
Post Office ————————

(If in city, street and number)
(Here follow 20 numbered lines for signatures)

Section 4. Each petition shall be duplicated for the securing of signatures and each sheet for signatures shall be attached to a copy of the petition. Any person signing such petition with any name other than his own or signing his name more than once to the same petition or duplicate thereof, or signing such petition when he is not a legal voter, shall be guilty of a felony.

Section 5. Each sheet of any such petition containing signatures shall be verified on the back thereof in substantially the following form, by the person who circulated said sheet or petition by his or her affidavit thereon and as a part thereof:

State of Oklahoma, ⎫ ss.
County of ————. ⎭

I, ————, being first duly sworn, say: (here shall be legibly written or typewritten the names of the signers of the sheet), signed this sheet of the foregoing petition, and each of them signed his name thereto in my presence; I believe that each has stated his name, county, post office address and residence correctly and that each signer is a legal voter of the State of Oklahoma and County of ————.

(Signature and post office of affiant)
Subscribed and sworn to before me this ———— day of ————, A.D. 19—.

(Signature and title of the officer before whom the oath is made, and his post office address)

Section 6. Each petition when filed with the county clerk shall be stamped with the date of filing and shall not be used as

containing more than one-half of one per cent ($\frac{1}{2}$ of 1%) of alcohol by volume and not more than three and two-tenths per cent (3.2%) of alcohol by weight be prohibited (or permitted, if at that time prohibited) in ———— County.

Name ————————
County ————————
Residence ————————
Post Office ————————

(If in city, street and number)
(Here follow 20 numbered lines for signatures)

Section 4. Each petition shall be duplicated for the securing of signatures and each sheet for signatures shall be attached to a copy of the petition. Any person signing such petition with any name other than his own or signing his name more than once to the same petition or duplicate thereof, or signing such petition when he is not a legal voter, shall be guilty of a felony.

Section 5. Each sheet of any such petition containing signatures shall be verified on the back thereof in substantially the following form, by the person who circulated said sheet or petition by his or her affidavit thereon and as a part thereof:

State of Oklahoma, ⎫ ss.
County of ————. ⎭

I, ————, being first duly sworn, say: (here shall be legibly written or typewritten the names of the signers of the sheet), signed this sheet of the foregoing petition, and each of them signed his name thereto in my presence; I believe that each has stated his name, county, post office address and residence correctly and that each signer is a legal voter of the State of Oklahoma and County of ————.

(Signature and post office of affiant)
Subscribed and sworn to before me this ———— day of ————, A.D. 19—.

(Signature and title of the officer before whom the oath is made, and his post office address)

Section 6. Each petition when filed with the county clerk shall be stamped with the date of filing and shall not be used as

a basis for the calling of any election after the first election called pursuant thereto. No person signing a petition shall be permitted to withdraw his name or have it taken from such petition after same shall have been filed as aforesaid. Provided, that any name proven not to be the signature of the person purporting to sign the same and any name proven not to be that of a legal voter of said county shall not be counted as a petitioner.

Section 7. The election shall not be held on the same day that a primary or general election is held in said county nor within thirty (30) days next preceding or following such primary or general election. No election shall be held pursuant to this Act in the same county oftener than once in every two (2) years.

Section 8. When an order has been made by the Board of County Commissioners for the holding of an election, it shall be the duty of the county clerk to cause a copy of said order to be published once a week for three (3) consecutive weeks in some weekly or daily newspaper published and of general circulation in said county, the first of said publications being not less than twenty (20) days prior to the date of such election. If there be no such newspaper published in the county, or the proprietor of such newspaper refuses to publish said advertisement, notice shall be given by posting a copy of such order in not less than five (5) conspicuous places in each precinct of the county at least twenty (20) days prior to the date of said election. Proof of said publication or posting shall be filed with the county clerk.

Section 9. The proposition to be voted upon shall be stated on the ballot without emblems and two spaces left upon the right side of same, one for votes favoring the proposition to be designated by the word, "yes," and one for votes opposing it to be designated by the word, "no." The elector shall designate his vote by a cross mark placed opposite the said yes or no. Whenever at the time of the election beverages are being legally sold in the county,

a basis for the calling of any election after the first election called pursuant thereto. No person signing a petition shall be permitted to withdraw his name or have it taken from such petition after same shall have been filed as aforesaid. Provided, that any name proven not to be the signature of the person purporting to sign the same and any name proven not to be that of a legal voter of said county shall not be counted as a petitioner.

Section 7. The election shall not be held on the same day that a primary or general election is held in said county nor within thirty (30) days next preceding or following such primary or general election. No election shall be held pursuant to this Act in the same county oftener than once in every two (2) years.

Section 8. When an order has been made by the Board of County Commissioners for the holding of an election, it shall be the duty of the county clerk to cause a copy of said order to be published once a week for three (3) consecutive weeks in some weekly or daily newspaper published and of general circulation in said county, the first of said publications being not less than twenty (20) days prior to the date of such election. If there be no such newspaper published in the county, or the proprietor of such newspaper refuses to publish said advertisement, notice shall be given by posting a copy of such order in not less than five (5) conspicuous places in each precinct of the county at least twenty (20) days prior to the date of said election. Proof of said publication or posting shall be filed with the county clerk.

Section 9. The proposition to be voted upon shall be stated on the ballot without emblems and two spaces left upon the right side of same, one for votes favoring the proposition to be designated by the word, "yes," and one for votes opposing it to be designated by the word, "no." The elector shall designate his vote by a cross mark placed opposite the said yes or no. Whenever at the time of the election beverages are being legally sold in the county,

the form of the proposition shall be thus stated:

Shall the County Option Law be adopted in ———— County?
Name

( ) Yes
( ) No.

Whenever at the time of the election the County Option Law is in effect in the county, the form of the proposition shall be thus stated:

Shall the County Option Law be abandoned and no longer in effect in ———— County?                                   Name

( ) Yes
( ) No.

Section 10. The election, including the canvass and counting of the. ballots, shall be held in accordance with the provisions of the general election laws of the State, and the duties of all officers pertaining thereto shall devolve upon and shall be performed by each of them in relation to said election the same as in general elections, except as same may be modified by or inconsistent with the terms of this Act.

The cost of the election shall be borne by the county and allowed and paid in the same manner as costs and expenses of general elections.

Section 11. Any act or deed denounced as an offense by the general laws of the State concerning general elections shall also be an offense in elections held under the provisions of this Act and shall be punished in the same manner as is provided for punishment of similar offenses by the general laws. Not more than sixty (60) and not less than thirty (30) days prior to an election any group of citizens or committee, which in good faith advocates or opposes the proposition to be submitted, may file with the secretary of the county election board a petition asking that such petitioners be recognized as the committee entitled to appoint challengers and watchers to act as such at the various polling places throughout the county. If more than one group or committee claim the right to such recognition as repre-

senting the respective opponents by filing such petition, the county election board shall promptly decide and publicly announce which committee is entitled to nominate such challengers and watchers. Such decision, however, shall not be final, but any aggrieved party may institute proceedings in the county court, and upon hearing the county judge shall determine which of such committees shall be recognized.

Section 12. The respective committees advocating or opposing the proposition may name and appoint a person to act as challenger and a person to act as watcher at said election at each or any of the precincts in said county; said challengers and watchers to be commissioned in writing by such committees, and to perform the duties and exercise the powers and be governed by the laws relating to challengers and watchers at general elections.

Section 13. The respective groups or committees mentioned in the preceding sections may, within the time and in the manner provided by statute with reference to candidates for county office in general elections contest the announced results of said election. Such contest shall be heard and determined in the manner provided by statute with reference to such contests for county office.

Section 14. Upon each day that an election is held under the provisions of this Act, it shall be unlawful to sell, barter, give away, or otherwise furnish such beverages within the county in which such election is held.

Section 15. Whenever a majority of the votes cast at an election shall be in favor of the adoption of the County Option Law in said county, said law shall be in full force and effect from an after the expiration of thirty (30) days from the date of said election.

Section 16. Whenever a majority of the votes cast at an election in favor of the discontinuance of the County Option Law in such county, said law having been previously in effect therein, said law shall cease to operate in said county at the ex-

tive opponents by filing such petition, the county election board shall promptly decide and publicly announce which committee is entitled to nominate such challengers and watchers. Such decision, however, shall not be final, but any aggrieved party may institute proceedings in the county court, and upon hearing the county judge shall determine which of such committees shall be recognized.

Section 12. The respective committees advocating or opposing the proposition may name and appoint a person to act as challenger and a person to act as watcher at said election at each or any of the precincts in said county; said challengers and watchers to be commissioned in writing by such committees, and to perform the duties and exercise the powers and be governed by the laws relating to challengers and watchers at general elections.

Section 13. The respective groups or committees mentioned in the preceding sections may, within the time and in the manner provided by statute with reference to candidates for county office in general elections, contest the announced results of said election. Such contest shall be heard and determined in the manner provided by statute with reference to such contests for county office.

Section 14. Upon each day that an election is held under the provisions of this Act, it shall be unlawful to sell, barter, give away, or otherwise furnish such beverages within the county in which such election is held.

Section 15. Whenever a majority of the votes cast at an election shall be in favor of the adoption of the County Option Law in said county, said law shall be in full force and effect from and after the expiration of thirty (30) days from the date of said election.

Section 16. Whenever a majority of the votes cast at an election in favor of the discontinuance of the County Option Law in such county, said law having been previously in effect therein, said law shall cease to operate in said county at the ex-

piration of thirty (30) days from the date of said election.

Section 17. Whenever the provisions of this Act have become effective in any county through adoption by a majority vote of the legal and duly registered voters such county, it shall be unlawful for any person to manufacture, sell, barter, give away, procure for, or otherwise furnish to another, or to keep for sale barter, distribution or otherwise furnishing, directly or indirectly, in such county, any of the beverages in this Act described. It shall further be unlawful for any person to transport any of such beverages in said county, except in course of continuous transportation from a point beyond the limits of said county, where the manufacture and sale of said beverages may be legal, to a point beyond the limits of said county where such sale may also be lawful. No license for the manufacture or sale of such beverages in such county shall be issued.

Section 18. It shall further be unlawful for any person representing either the buyer or seller to distribute, solicit or receive contracts, proposals or orders for the purchase, sale or delivery in such county of any of such beverages.

Section 19. It shall be unlawful for any person in such county to receive or accept any such beverage from a common carrier, or from any other person who has transported such beverage into such county.

Section 20. Any person knowingly or intentionally, renting, hiring, letting, lending, leasing or permitting the use of or using any automobile or other motor vehicle, used in hauling the same, for the purpose of unlawfully manufacturing, selling, transporting or possessing beverages in violation of this Act, shall be guilty of maintaining a public nuisance and of a violation of this Act. Any property so used shall become forfeited to the State of Oklahoma, and an action to declare such forfeiture may be instituted in the name of the State of Oklahoma on relation of the county attorney or the Attorney General.

piration of thirty (30) days from the date of said election.

Section 17. Whenever the provisions of this Act have become effective in any county through adoption by a majority vote of the legal and duly registered voters of such county, it shall be unlawful for any person to manufacture, sell, barter, give away, procure for, or otherwise furnish to another, or to keep for sale, barter, distribution or otherwise furnishing, directly or indirectly, in such county, any of the beverages in this Act described. It shall further be unlawful for any person to transport any of such beverages in said county, except in course of continuous transportation from a point beyond the limits of said county, where the manufacture and sale of said beverages may be legal, to a point beyond the limits of said county where such sale may also be lawful. No license for the manufacture or sale of such beverages in such county shall be issued.

Section 18. It shall further be unlawful for any person representing either the buyer or seller to distribute, solicit or receive contracts, proposals or orders for the purchase, sale or delivery in such county of any of such beverages.

Section 19. It shall be unlawful for any person in such county to receive or accept any such beverage from a common carrier, or from any other person who has transported such beverage into such county.

Section 20. Any person knowingly or intentionally, renting, hiring, letting, lending, leasing or permitting the use of or using any automobile or other motor vehicle, used in hauling the same, for the purpose of unlawfully manufacturing, selling, transporting or possessing beverages in violation of this Act, shall be guilty of maintaining a public nuisance and of a violation of this Act. Any property so used shall become forfeited to the State of Oklahoma, and an action to declare such forfeiture may be instituted in the name of the State of Oklahoma on relation of the county attorney or the Attorney General. Upon a

Upon a judgment of forfeiture, the court shall direct the sheriff to sell the property. Said sale shall be had in the same manner as sales under execution. The sheriff shall pay first out of the proceeds of said sale, after deducting costs of sale, any valid bona fide recorded lien on the property so sold. The Court shall have power, in its discretion, to order a sale subject to said lien or liens. No lien on any property so sold shall be paid unless recorded prior to the committing of said nuisance, except upon proof by the lienor that he had no knowledge of such illegal use of such property.

Section 21. Whenever the prohibitory provisions of this Act have been adopted in any county, the provisions of the prohibitory liquor laws of the State of Oklahoma and penalties therein provided shall, in the absence of a specific provision of this Act, be equally applicable in said county to the manufacture, sale, barter, distribution, or other furnishing or transporting of the beverages in this Act described.

Section 22. If any section, paragraph, sentence or phrase of this Act shall be declared unconstitutional or void for any reason by any court of final jurisdiction, such Act shall not in any way affect the remaining sections, paragraphs, sentences, or phrases of this Act, but the same shall continue in full force and effect.

Section 23. All Acts and parts of Acts in conflict herewith are hereby repealed.

judgment of forfeiture, the court shall direct the sheriff to sell the property. Said sale shall be had in the same manner as sales under execution. The sheriff shall pay first out of the proceeds of said sale, after deducting costs of sale, any valid bona fide recorded lien on the property so sold. The Court shall have power, in its discretion, to order a sale subject to said lien or liens. No lien on any property so sold shall be paid unless recorded prior to the committing of said nuisance, except upon proof by the lienor that he had no knowledge of such illegal use of such property.

Section 21. Whenever the prohibitory provisions of this Act have been adopted in any county, the provisions of the prohibitory liquor laws of the State of Oklahoma and penalties therein provided shall, in the absence of a specific provision of this Act, be equally applicable in said county to the manufacture, sale, barter, distribution, or other furnishing or transporting of the beverages in this Act described.

Section 22. If any section, paragraph, sentence or phrase of this Act shall be declared unconstitutional or void for any reason by any court of final jurisdiction, such Act shall not in any way affect the remaining sections, paragraphs, sentences, or phrases of this Act, but the same shall continue in full force and effect.

Section 23. All Acts and parts of Acts in conflict herewith are hereby repealed.

Section 25. It being immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, by reason whereof this Act shall take effect and be in full force from and after its passage and approval.

---

This demonstrates to me that the original sponsor did in fact merely copy the Legislative "Bill" as a "Proposal" to be submitted to a popular vote.

So it develops that the real question for our determination is: May a person prepare or copy a writing which in all its verbiage and substance is in truth and in

fact a bill, or an act, or a legislative enactment and have it voted upon for adoption as a constitutional amendment? The majority answers that question in the affirmative, but I would answer it in the negative.

To me it is clearly apparent that this so-called "Proposal" contains matter which the sponsor or sponsors had no right to seek to have incorporated into the Constitution, though of course this identical matter could have been proposed for adoption as an item of legislation.

The proponents of the Initiative Petition argue that the people may submit anything they like, either as an amendment to the Constitution, or to be adopted as a provision of the statute.

Generally, we agree with that contention, but I am convinced that it has no application here because I am satisfied that a sponsor of an initiative measure has no right to prepare that which in all material substance is in truth and in fact an amendment to the Constitution and have it initiated and voted upon as a purported statutory provision. On the other hand, I am convinced that such a sponsor of an Initiative Petition has no right to prepare matter which in all material substance is in truth and in fact a pure legislative enactment, and by his merely naming it a constitutional amendment, have such statutory matter voted upon and perhaps adopted generally into or as a part of the Constitution of the State.

It is shown that the first line of the proposal here involved refers to the proposal as "An Act" and that the proposal refers to itself as an act in many instances throughout the many sections of the proposal, and the act or the so-called proposal provides in Section 22:

"If any section, paragraph, sentence or phrase of this Act shall be declared unconstitutional or void for any reason by any court of final jurisdiction, such Act shall not in any way affect the remaining sections, paragraphs, sentences, or phrases of this Act, but

the same shall continue in full force and effect."

And we observe that the Act or so-called Proposal provides in Section 23 as follows:

"All Acts and parts of Acts in conflict herewith are hereby repealed."

These expressions in the proposal are wholly foreign to anything that could be properly set out in a constitutional amendment, and they directly contradict any contention that this proposal could be submitted as a constitutional amendment.

Thus it is quite apparent that this writing or matter prepared and named a "Proposal" by the sponsors was purely a legislative Act and in its form and in its substance was not proper to be proposed as a constitutional amendment.

The majority opinion states that. "having concluded that sections numbered 22 and 23 are surplusage, and neither add to nor subtract from the meaning and effect of the proposed amendment, said sections numbered 22 and 23 should be, and the same are, hereby stricken from the petition."

If that conclusion is correct then it would follow that the order striking these sections would neither help nor hurt the proposal.

However, I think these two sections constituted an integral part of the proposal when it was drawn and remained so when the petitions were signed and when the overall petition was approved by the Secretary of State, and when the cause was presented in this court, and that said sections further demonstrate the serious impropriety, and I think the illegality, of the proposal as and for a constitutional amendment.

This court is reluctant to deny the people of this State the right to vote on any proposal submitted for their vote, but no authority is shown which would give us the power to change an Initiative Petition and submit to the vote of the people a proposal to be voted on as a statute when the Initiative Petition seeks to have it voted

upon as a constitutional amendment. The converse would also be true. As I see it, nothing whatever can be done unless or except that sponsors of Initiative Petitions draw their proposal so that each one will be in truth and in fact either an amendment to the Constitution, or a proposed adoption of statutory law, so that the clear separation of the two may be preserved, and so that the people may freely adopt items of statutory law by their vote, or may adopt amendments to the Constitution by their vote, but may not be either required or permitted to confuse and commingle the two to the great detriment or damage, or perhaps destruction, of the Constitution.

In 11 Am.Jur. Sec. 3, page 603, it is stated:

"3. Generally; Distinctions from Statutes.—

"A Constitution differs from a statute in that a statute must provide, at least to a certain degree, the details of the subject to which it treats, whereas a Constitution usually states general principles and builds the substantial foundation and general framework of the law and government, Statutes are enactments and rules for the government of civil conduct, promulgated by the legislative authority of a state. It is an important characteristic of such laws that they are tentative, occasional, and in the nature of temporary expedients. Constitutions, on the other hand, are expressions of the sovereign will in relation to the structure of the government, the extent and distribution of its powers, the modes and principles of its operation, and the apparatus of checks and balances proper to insure its integrity and continued existence. Constitutions are primary, being the commands of the sovereign establishing the governmental machine and the most general rules for its operations. Statutes are secondary, being commands of the sovereign having reference to the exigencies of time and place resulting from the ordinary working of the machine."

"Sec. 4. Permanency and Generality.—Two of the outstanding characteristics of any American Constitution are permanency and generality. A Constitution is intended not merely to meet existing conditions, but to govern the future. It has been said that the term 'constitution' implies an instrument of a permanent nature.

"Since it is recognized that the framers of a Constitution cannot anticipate conditions which may arise thereafter in the progress of the nation or establish all the law which from time to time may be necessary to conform to the changing conditions of a community, as a rule a Constitution does not deal in details, but enunciates the general principles and general directions which are intended to apply to all new facts that may come into being and which may be brought within these general principles or directions * * *."

If this proposal which is so completely an Act or a legislative bill in all of its form and substances could be set bodily into the Constitution as a so-called constitutional amendment, then so could any one or all of our many enactments of the Legislature, or the many "Bills" introduced therein, but not passed.

Of course many of the provisions of our statutes, in substance, could be voted into our Constitution if the substance thereof be drafted to be and constitute an actual amendment to some section or article of the Constitution or so as to constitute a new section or article thereof, but certainly that is not to say that any legislative bill, in its original from and substance as such "Bill" may be voted into the Constitution.

Our duty to " * * * *support, obey, and defend* * * * *the Constitution of the State of Oklahoma* * * *" set out in the oath of office (Art. 15, Sec. 1, Oklahoma Constitution) requires that we protect that Constitution from even the chance of such a proposal as this, lest un-

der the guise of "amendments" we impair the necessary efficiency and usefulness of this fundamental law of our State.

The rule is and must be that our Constitution may be amended at will by the voters of the State, but it must be done only by proposals which can and do amend the Constitution, and never by mere legislative bills erroneously named and proposed as constitutional amendments.

Further, in 28 Am.Jur. Sec. 14, p. 160, it is stated:

"Any action taken under initiative provisions, contained as they are in constitutions and statutes, must, of course, comply with such Constitutions and Statutes. *For instance, a Constitution cannot be amended by an initiative act which is legislative in its character. * * *"* (Emphasis supplied.)

In State ex rel. Halliburton v. Roach, 230 Mo. 408, 130 S.W. 689, 139 Am.St.Rep. 639, it was held:

"Constitutional Amendments and Legislative Act Distinguished.—The line of demarcation between a constitutional amendment and a purely legislative act is well defined. Constitutional provisions and amendments relate to the fundamental law and certain fixed first principles upon which government is founded; they are permanent, uniform and universal, and can be amended and revised only according to the provisions contained therein." 139 Am. St.Rep. 640.

"Initiative And Referendum.—The Distinction between Constitutional provisions and legislative acts is clearly and distinctly recognized by the initiative and referendum amendment to the constitution, by express separate provisions for the adoption of each." 139 Am.St.Rep. 640.

Our Constitution, like the Missouri Constitution, makes separate provision for the initiating of constitutional amendments and for legislative acts or statutory amendments.

In the Roach case, supra, the Missouri Court used this pertinent language:

"This brings us to the consideration of the petitions as presented for acceptance and filing to the Secretary of State. While these petitions are named and called a 'proposed amendment to the Constitution of Missouri,' *yet we take it that the allegations of the petitions and what is shown upon the face of them must finally determine their nature and character;* that is, whether or not it is in fact an amendment to the Constitution or is purely a legislative act. * * *" 230 Mo. 429, 130 S.W. 693, 139 Am.St.Rep. p. 647. (Emphasis supplied.)

"That this proposed constitutional amendment is but a purely legislative enactment, in our opinion, is too plain for argument, and will only require a moment's consideration to convince the most credulous upon that subject. * * *" 230 Mo. 430, 130 S.W. 693, 139 Am.St.Rep. 648.

"The line of demarcation between a constitutional amendment and a purely legislative act is well defined. [Citing authorities]" 230 Mo. at page 432, 130 S.W. at page 694, 139 Am.St.Rep. at page 649.

"* * * *The petitions themselves as presented to the respondent clearly indicate that the so-called constitutional amendment* is nothing more nor less than a temporary legislative act. * *" (Emphasis supplied.)

"We therefore, repeat that the petitions in this case do not propose, within the purview of the Constitution and laws of this state, an amendment to the Constitution." 230 Mo. 435, 130 S.W. 695, 139 Am.St.Rep. at page 651.

"Obviously in determining the nature and character of the measure proposed in the petitions presented to the respondent, we must look to the subject matter with which they deal. *The mere calling it an amendment to the Constitution, unless the subject-matter veri-*

*fies the correctness of that name, is not binding either upon the respondent or upon this court."* (Emphasis supplied.)

Words and phrases, Vol. 2, p. 9 et seq., cites numerous decisions from this and other states, dealing with the definition of the word "Act." We quote therefrom as follows:

"The word 'act' is equivalent to 'statute.' United States v. Smith, 27 Fed. Cas. [pp.] 1167, 1170 [No. 16,338] * * *

"In the Constitution of New York the words 'bill,' 'law,' and 'act' are used somewhat indefinitely, but it seems that there is little difference between the terms. People v. Lawrence, 36 Barb., N.Y., 177, 187."

See, also, Norris v. Cross, 25 Okl. 287, 105 P. 1000, and Board of Trustees of Firemen's Relief and Pension Fund of City of Muskogee v. Templeton, 184 Okl. 281, 86 P.2d 1000.

Here it is interesting to note the many times the word "act" is used in the "proposal" here considered. This would emphasize the fact that this "proposal" does not meet the requirements to be voted on as a constitutional amendment. It is in truth an "act" and it boldly and repeatedly asserts in its many sections that it is just that: An "Act."

16 C.J.S. Constitutional Law § 7, c, pp. 38, 43, states:

"In a proceeding to compel or restrain the placing of an initiated proposal for a constitutional amendment on the ballot, *the court may ascertain whether or not the form of the petition complies with the requirements* as well as the sufficiency of the signatures." (Emphasis supplied.)

In 11 Am.Jur. Sec. 23, p. 628, it is stated:

"Scope of Alterations.—* * * In spite of the general acceptance of the rule as to the unlimited power of the people in making changes in the fundamental law, a *distinction between legislative acts and constitutional provisions* has been drawn in certain jurisdictions where changes in the Constitution and in the statutory law may be made by initiative and referendum; *and the rule has been announced that matters properly belonging to the statutory law cannot properly be inserted in the state Constitution."* (Emphasis supplied.)

In State ex rel. Halliburton v. Roach, supra (230 Mo. at page 421, 130 S.W. at page 690, 139 Am.St.Rep. at page 641), it is further held and stated as follows:

"Initiative and Referendum—Constitutional Amendment.—The term 'law' and 'amendments to the constitution' are used in the initiative and referendum amendment to the constitution in their plain and ordinary sense, and there *cannot be put into the constitution,* by way of amendment, *mere* legislative acts providing for the exercise of certain powers. * * *"

And in the body of that opinion we find this language:

"The rules and principles applicable to the submission of constitutional amendments to the voters of this state are applicable alike to amendments proposed to the constitution under the initiative and referendum amendment or amendments to the constitution proposed by the General Assembly of this state. *Whichever course is pursued in submitting the amendment, it must, in fact, be an amendment to the Constitution.* If submitted through the initiative, manifestly that provision contained in the initiative and referendum amendment that 'the petition shall include the full text of the measure so proposed' must be complied with. *In other words, if it is truly an amendment to the constitution, the full text of the amendment and what provision of the Constitution it undertakes to amend* must be embraced in the petition. * * [Emphasis supplied.]

"The initiative and referendum amendment to the Constitution speaks of laws and amendments to the Con-

stitution. Manifestly, those terms are used in their plain and ordinary sense, and, in our opinion, the petitions have no right to undertake to put in the Constitution, which is regarded as the organic and permanent law of the state, mere legislative acts providing for the exercise of certain powers. * * *

"In other words, the petitions are not *legally sufficient, for the reason,* * * *that the subject dealt with* in the petitions are *not the proposal of a constitutional amendment.* * * *"* (Emphasis supplied.)

Another serious fault of this initiative petition, as drafted and circulated for signatures, lies in the uncertainty of the petition, and the fact that it could very well have been misleading or confusing to the signers thereof. Many voters might be willing to sign a petition to adopt this "proposal" as a *law* of the State, but not willing to petition its adoption *as a constitutional amendment.* There is room for confusion here because if a voter who signed the petition read only the request to the Governor, it is clear that such a voter thought he was requesting the submission of a constitutional amendment. On the other hand, it is equally clear that if a voter read the body of the proposed measure, he would conclude from the language contained in the "proposal" that he was signing a request to submit a proposed legislative act.

In oral argument in this case it is conceded that this proposal was not carefully prepared to be submitted as a possible constitutional amendment. I think that is a grave understatement. Originally great care was exercised in the drafting of each section and of each sentence in our Constitution. That has been generally true of each amendment subsequently adopted, and that is the least that should characterize any proposed amendment to our fundamental law as set out and perpetuated in our Constitution. I find that this proposal is not at all proper, that it is critically improper from beginning to end as a proposed constitutional amendment. It is this court's duty to

sustain the protest on that account, in my view.

For the reasons stated I respectfully dissent to the majority holding that this "proposal" above quoted is proper to be submitted for adoption as a constitutional amendment.

I am authorized to say that DAVISON and JOHNSON, JJ., concur herein.